## Case No. 7,320.

### The J. H. STARIN.

[15 Blatchf. 473; 45 Conn. 585; 8 Reporter, 293.] [1]

Circuit Court, D. Connecticut. Jan. 24, 1879.

[1] [Reported by Hon. Samuel Blatchford. Circuit Judge, and here reprinted by permission. 8 Reporter, 293, contains only a partial report.]

Simeon E. Baldwin, for libellant.

George H. Watrous, William B. Wooster, and Morris F. Tyler, for claimant.

BLATCHFORD, Circuit Judge. The facts of this case are largely set forth in the judgment rendered by the district court. The question is one of law, as to what rights were conferred on the libellant by the statute law of the state of Connecticut, in respect to wharfage, so called, on goods in the situation of those involved in the present case. The decision of the highest court of the state of Connecticut on the very question must be accepted as the proper interpretation of such statute law. In 1837, the case of Union Wharf Co. v. Hemingway, 12 Conn. 293, an action of assumpsit for the wharfage of goods, brought by the same corporation which is the libellant in this case, was decided by the supreme court of errors of Connecticut. The defendants in that case owned vessels which ran from New Haven to New York and back, and also owned stores or warehouses on the west side of the plaintiff's wharf. These vessels discharged their car-

goes at the Basin wharf, on the outer side thereof, at a point more than three rods distant from the plaintiff's wharf; and the goods thus landed upon the Basin wharf were transported across the plaintiff's wharf to the defendant's said stores, or were transported upon the plaintiff's wharf to the main land. Then, as now, the Basin wharf abutted on the libellant's wharf on the east side of the libellant's wharf. Then, as now, the libellant's wharf and the Basin wharf were each of them used as a free public highway to pass and repass upon. The proprietors of the libellant's wharf demanded and received wharfage from all parties using it, continuously, from the year 1746. In 1760, the colonial legislature granted to the proprietors of the libellant's wharf a charter, incorporating them as "The Union Wharf Company in New Haven," and recognized their ownership of such wharf, and gave them power to repair and manage said wharf for the future, and to keep accounts, and to take care of the wharfage of the wharf, through a committee, which committee should account for the receipts of the company, and to agree with any member to keep the wharf in repair, and take the profits till they should satisfy his disbursements. In October, 1801, the legislature of Connecticut (1 Priv. Laws Conn. p. 523), incorporated the owners and proprietors of the libellant's wharf, by the name of "The Union Wharf Company in New Haven." The resolve of incorporation authorized the company, "at all times hereafter, to make all necessary contracts for the rebuilding, repairing or extending said wharf and pier, in such manner as they shall direct, and for keeping the same in repair," and to assign to the contractors the income of the wharf, and the right to collect the wharfage established by the company, from time to time, until the income should reimburse the expenditure, with interest, after which the income should revert to the company, subject to such reasonable restrictions or extensions with respect to repairs and wharfage as the legislature might then think proper to adopt. In May, 1810, the legislature of Connecticut (Id. p. 497), incorporated the libellant by the name of "The Contractors to Rebuild and Support Union Wharf and Pier in New Haven," and gave the corporation power to make such ordinances as it might find necessary to regulate the mode of receiving, collecting and enforcing the payment of wharfage. The corporators were authorized to appoint five directors to manage the concerns of the company. The resolve proceeds: "And the directors so chosen may appoint, from time to time, a suitable person as a wharfinger, who shall have power to collect and receive the wharfage when due, and, upon neglect or refusal to pay the same after notice and demand, it shall be lawful for such wharfinger either to sue for the same at common law, or to distrain for such wharfage, on any goods or chattels found on board the ship or vessel from which

the same shall have accrued, and the goods or chattels so distrained to sell and dispose of in the same manner as if taken on execution, and the wharfage due for or on account of any ship or vessel, or the cargo thereof, shall be, and remain, a lien on such ship or vessel until the same shall be discharged." Prior to the resolve of 1810, the wharf company had contracted with the parties who became so incorporated in 1810 as the libellant, for the rebuilding, extension and maintenance, by the latter, of such wharf and pier. Soon after the libellant was so incorporated, it rebuilt and extended the wharf and pier, according to such contract, and received from the wharf company an assignment of the income thereafter to accrue from said wharf and pier, and the right to collect all the wharfage thereafter to accrue by reason of the use of the same, in any manner, by any parties, from time to time. Afterwards, and in October, 1815, the legislature of Connecticut passed a resolve declaring that the libellant has the right of collecting wharfage to reimburse it for its expenses, according to its contract with the Union Wharf Company, at a rate not exceeding a tariff annexed to said resolve, and thereby establishing said tariff accordingly, and further declaring, "that neither the claims of any individual or individuals to be exempted from wharfage, nor the claims of said company to demand wharfage of such individual or individuals, shall be in any way affected by this resolve." This tariff fixes, as wharfage, so much per ton per year for vessels belonging to New Haven, employed in foreign trade, and so much per ton per year, for coasting vessels belonging to New Haven, the above to be payable semi-annually, July 1st and January 1st, and so much per ton per day for coasting vessels not belonging to New Haven, and so much per ton per day for sea vessels not belonging to New Haven, with the privilege to vessels not belonging to New Haven to enter at any time for one year, by paying in advance the same wharfage as vessels belonging to New Haven. "All goods landed from or put on board coasting vessels" were required "to pay the following rates of wharfage," different articles of merchandise being specified, and the rate of wharfage being fixed at so much each, or so much per ton, or bale, or cubic foot, or bag, or thousand, or box, or fifty feet, or hundred weight, or dozen bottles, or dozen, or cask, or hogshead, etc. The resolve proceeds: "All other articles not enumerated, in same proportion. Goods or merchandise taken by water from, or by water put on board, coasting vessels lying at, or attached to vessels made fast to, the wharf, to pay half wharfage, unless the said goods or merchandise be conveyed to or from the wharf to any store adjoining the same, in which case full wharfage shall be charged. All vessels belonging to this port, which either lie at the wharf, or use it by taking on board or landing any part of their cargo or

passengers, shall pay six months' wharfage on the vessel, which vessel shall be entitled to the use of the wharf (if after January) until the next following July; (if after July) until the next following January. Vessels coming into this port, which enter by the year, shall pay wharfage at the rates above established, from the time they arrive till the next following January or July. Vessels, owners, masters and goods are liable for wharfage. * * * All articles landed on the wharf, and remaining more than four days, shall pay, in addition, for each day after, one-fourth of the established rates of wharfage. All articles brought by land and left on the wharf, shall, after the expiration of four days, be liable to the same rate of wharfage as if imported by water, and, if left in such a situation as will incommode the free use of the wharf, and the owner, or person having charge thereof, shall neglect to remove the same, on notice from the wharfinger, the same shall be deemed a nuisance, and may be removed by the wharfinger at the expense of the owner. Ballast deposited on the wharf shall be liable to wharfage, if suffered to remain more than four days without special license from the wharfinger, and, if left on the wharf after the vessel which discharged it shall have departed from the port, shall be forfeited to the use of the company. Provided, however, that this resolve shall at all times be liable to be altered or repealed by the general assembly." The resolve also provided, that sea vessels not belonging to New Haven should be liable to "the same wharfage, for goods landed or taken off, as coasting vessels." The following resolve was passed in May, 1819 (1 Priv. Laws Conn. p. 502): "Upon petition of the contractors, praying for an alteration in their tariff of wharfage and proviso contained in their former grant. Resolved by this assembly, that, in lieu of said proviso, and the exemptions heretofore claimed, the following alterations of, and additions to, the rates of wharfage heretofore established, be made and become permanent, and not subject to be altered, without the sanction of this assembly, viz: First. That lumber landed by water, in any of the yards adjoining the wharf, shall pay only one-half the rate of wharfage heretofore established, provided the lumber is owned by the proprietors or occupants of the yard. Second. Goods or merchandise, other than lumber, landed from a coasting vessel, into any of the back doors of the stores, or back yards, if to be exported in a sea vessel, without coming on to the wharf in front of said stores or yards, and all articles landed in the same manner from any vessel employed in foreign trade, and exported coastwise, without coming on to the wharf in front, shall pay only one-half the rates of wharfage heretofore established. Third. All articles landed from a coasting vessel into any of the stores or yards aforesaid, if to be exported coastwise, and not coming on to the wharf in front, shall pay half the established rate of wharfage when landed, and half when taken off. Fourth. No goods or merchandise landed into, or shipped from, any of the back doors of stores, or yards adjoining the wharf, shall be exempted from the payment of wharfage on both landing and shipping, unless owned by the owners or occupiers of said stores or yards. Fifth. All articles landed on any part of the wharf, from a coasting vessel, if reshipped within two days, coastwise, shall not pay only one wharfage, provided the said articles have not been carted up or down the wharf, and have not been sold. Sixth. Goods shipped, and immediately relanded, shall pay only one wharfage. And the petitioners shall have the same power and authority to collect the wharfage hereby established, and to enforce the collection thereof, in the same manner as is provided for the collection of the wharfage heretofore established, any law or provision in said former resolve to the contrary notwithstanding." In 1826, the Union Wharf Company and the libellant entered into an agreement with the Farmington Canal Company, a Connecticut corporation, whereby the canal company was authorized to construct a canal basin on the east side of the libellant's wharf, and to enclose the seaward side thereof by an embankment or wharf running from the main land near the foot of Brewery street, to the east side of libellant's wharf, and whereby the canal company was to forever keep in repair the part of the east side of the libellant's wharf which would be thus included in such basin, and the canal boats and their lading which should be transported up and down the canal within such basin, were to be free from wharfage; from the libellant's wharf; and by which it was provided, that all powers and rights not therein especially granted should be retained by the libellant. The canal company obtained the authority and constructed the basin and the embankment, such embankment being what is before referred to as the Basin wharf.

Such was the condition of things when the case of Union Wharf Co. v. Hemingway [supra], was decided. In the report of that case it is said: "The plaintiffs had, for thirty years, claimed and exercised the right of collecting wharfage on all goods brought upon their wharf, by land, from any adjoining wharves and yards, or landed at said wharves and yards and carried up the plaintiffs' wharf." The defendants in that suit had paid wharfage to the canal company on the goods landed from their vessels at the Basin wharf, and were indemnified by that company, and claimed that they used the plaintiffs' wharf in no other manner than as a public highway, and were not responsible to the plaintiffs for wharfage. The counsel for the defendants in that suit contended (1) that the plaintiffs had no title to the Basin wharf at the place where the goods were landed, which was a point more than three

rods east from the east side of the plaintiffs' wharf; (2) that, when the goods were put upon the Basin wharf from the vessel, they were landed, or removed from the water on to the land; that, therefore, they were not landed on the plaintiffs' wharf: and that their transportation over the plaintiffs' wharf, after they were landed, was transportation by land; (3) that no other use was made of the plaintiffs' wharf, for the goods, than to transport them thereon, as a public highway; (4) that the plaintiffs had no right, under any of their grants, of 1760, 1801, 1810, 1815 or 1819, to demand payment for the mere use of their wharf as a public highway; (5) that the plaintiffs could not rely on any usage proved, to charge for the use of their wharf as a public highway, because, first, the grant to them was not doubtful or equivocal in its provisions, and, second, the usage proved was a usage in regard to wharves and yards on the west side of the plaintiffs' wharf, erected under grants from them and on their flats. In giving judgment, the court said: "That the Union wharf is a free, open public highway, is not denied. But the plaintiffs claim, that they have the right to demand compensation for all goods brought by water, which are landed upon or pass over their wharf, and upon all goods transported or shipped from their wharf; and this seems not to be denied on the part of the defendants, but they claim that, as these goods were first landed upon or shipped from the Basin wharf, and transported up or across the plaintiffs' wharf only as a public highway, therefore, no wharfage can be demanded." The court then allude to the fact, that, in 1732, the proprietors of undivided lands in New Haven voted not to allow any wharf to be erected within three rods of the east side of the plaintiffs' wharf, nor within four rods of the west side, "thus holding out to those who would embark in this enterprise, that, if this wharf should become a public highway, those who, by means of it, imported or exported their goods, should not be allowed the facilities of another wharf, by which they could avoid a reasonable compensation for the expenses incurred in this then novel but important undertaking." The court further said: "Soon after, and, as we may fairly presume, in consequence of this vote, the original wharf was erected. Under this grant, though the wharf became a public highway, yet those who used it, to import or export goods, always paid a compensation therefor, under the denomination of wharfage; and it has not been denied but that, if goods imported were landed at a pier, and then transported in a boat or on the ice, to this wharf, and landed there, or transported over it, they would have been subject to wharfage; and, if another wharf had been built four rods distant, and goods imported were landed thereon, and then brought on to this wharf, upon the same principle, they must have been subject to wharfage. If such a wharf had been extended to the main land, the owners of this wharf could not complain, although it deprived them of much of their profits, because they must have known originally, that they were liable to this competition, and they were willing to risk it. But, as this wharf was erected for the accommodation of the importers and shippers of goods, it is but reasonable that those who used it for that purpose, should make compensation therefor; and, although the goods imported or shipped might first rest upon a pier or upon the ice, or even another wharf, yet, if they were placed upon this wharf for the purpose of reaching their place of destination, we think there is nothing in the fact that they were first placed upon another wharf, more than upon a pier or the ice, which would exempt them from wharfage. They obtained the very accommodation which this wharf was designed to give—a landing upon a structure connected with the main land. And when we consider, that, by the grant, no wharf was to be erected within four rods of this, we think that goods brought from such a wharf to this, to be transported to their place of destination, may be fairly said to be landed upon this wharf, and so, in the strictest sense, subject to wharfage. Had there been no connection between this wharf and the Canal wharf, these goods must have been brought in boats to the wharf of the plaintiffs, in which case they would have been literally landed on their wharf, and would certainly have been subject to wharfage. How, then, is the case altered by the arrangement made between the corporations? The canal company had no right to unite their wharf to the Union Wharf, or to build within three rods of it, without the consent of the plaintiffs. An arrangement, however, was made, and it is immaterial at whose request, and that consent was given, but upon certain terms and conditions. One of these conditions was, that the side of the Union wharf enclosed within the basin, should be free from wharfage for canal boats, and all articles transported either up or down in them; and the Union Wharf Company retained to themselves all powers and rights not especially granted to the canal company. The first mentioned provision clearly shows what was intended to be granted, as it regards wharfage—an exemption from wharfage on goods brought down or carried up the canal, and canal boats; not, however, upon all, but such only as should come or send their goods within the basin. How frivolous would this arrangement have been, if the claim of the defendants is admitted! How idle to provide, that goods coming down the canal might be free from wharfage, if all goods from any place were to be free from wharfage! If it should be said, that this exemption applies only to goods first landed upon Union wharf from the canal boats, it would deduct very little from the weight of the argument: for,

as these wharves were to be connected, whether the goods were first landed upon one or the other, would be a matter of trifling consequence, in such an arrangement. But, further, the Union Wharf Company, after the exemption, which is the only thing said about wharfage, expressly reserve all rights and privileges not expressly granted; and as they had granted no exemption but the one before stated, all other rights to wharfage, which they before had, remain with that corporation. Had not this junction of the two wharves been made, we have seen, that the plaintiffs would have been entitled to wharfage upon all goods landed, directly or indirectly, from a vessel, upon their wharf, for the purpose of arriving at their final destination, by means thereof, or upon goods shipped therefrom, in a similar manner. If goods imported have once been transported from a pier or wharf to the main land, then they may be no more liable to wharfage than any other goods brought from the country to the stores on the wharf; but goods brought by water, and landed on or transported over the plaintiffs' wharf, for the place of their destination, cannot free themselves from wharfage, by resting upon a pier, or the ice, or even another wharf. They cannot be said to be landed, in the one case, more than in the other. The canal company, when they took this grant from the Union Wharf Company, must have understood, that nothing was intended to be granted, but what was expressly granted; and they then received a grant of the flats upon which their wharf and basin is founded, from the proprietors of the town, upon the express stipulation, that this agreement between the Union Wharf Company and the canal company be ratified. They, therefore, agreed to build their wharf under these conditions and stipulations. But, by the claim now made, the Union Wharf Company are not to retain the power and enjoy the privileges they before did. The canal company are to take from them all the business which the space their wharf occupies will permit, and, at the same time, subject the wharf of the plaintiffs to a great share of the damage incident to such business. Such a construction of this contract the court cannot accede to. We consider it contrary to good faith, and contrary to the spirit of the contract and the intent of the parties, who, at the time, seemed desirous to guard the rights of the plaintiffs with great care. As between these corporations, therefore, every principle of law, as well as of justice, is in favor of the plaintiffs; and this suit is in fact, though not in form, a suit between these companies, for, the defendants are indemnified by the canal company. It is true, however, that the defendants' indemnification may fail; and they must have a right to be heard in their own defence. How, then, do they stand? The plaintiffs would have had a right to exact wharfage of them upon these goods so placed upon their wharf, before the erection of the Canal wharf. The defendants must, then, show how that right has been lost or varied, and, for this purpose, they must rely upon the rights of the canal company; and, if this company have no rights, as against the Union Wharf Company, to intercept their claim of wharfage, we do not see how the defendants can resist the claim. That they have paid their wharfage to the canal company, may evince what has been found by the jury, that there was no design to avoid wharfage; but it will not show that the plaintiffs were not entitled to it. And, if the plaintiffs would have been entitled to wharfage, aside from the intervention of the Canal wharf, the defendants must show, that, by means of that wharf, this right was lost. And, when the very instrument under which the wharf was erected, shows that the plaintiffs' right of wharfage was retained, it is not easy to see how the defendants can shelter themselves under it, more than the canal company. To a majority of the court, then, it appears that the plaintiffs, upon the facts admitted and proved in this case, are entitled to wharfage; and, of course, there must be a new trial." This judgment was delivered by Chief Justice Williams, with the concurrence of Judges Bissell, Huntington and Waite. Judge Church dissented.

It is entirely clear that the state court, in construing the legislative grants to the Union Wharf Company and to the libellant, and the contract with the canal company, asserted the truth of the following propositions: (1.) That goods arriving by water, by a coasting vessel, and transported over the libellant's wharf, to reach their place of destination on the main land, are liable to pay wharfage to the proprietors of such wharf, if they are discharged from such vessel upon the Canal wharf or Basin wharf, even at a point distant more than three rods easterly from the libellant's wharf, and then pass upon carts over the Basin wharf on to the libellant's wharf and up the latter wharf to points in the city beyond it; (2.) that, under such circumstances, such goods may be fairly said to be landed on the libellant's wharf; (3.) that the term "wharfage" includes the compensation for such use of the libellant's wharf; (4.) that the proprietors of the libellant's wharf, before the construction of the Basin wharf, had the right to demand wharfage as compensation for the use of their wharf, in transporting over it goods arriving by water in a coasting vessel, though first discharged from such vessel on a wharf four rods distant from the libellant's wharf, if they were afterwards transported over the libellant's wharf to reach their destination on the main land, beyond the libellant's wharf, and that the right to such wharfage was not abridged by anything in the agreement with the canal company, or by anything done thereunder, in the construction of the

basin or of the Basin wharf; and (5.) that the owner of the goods liable to such wharfage has no rights. as against the claim of the proprietors of the libellant's wharf, to such wharfage on such goods, which the canal company did not have.

Aside from the binding character of these adjudications of the highest state court on the questions in issue, reference may be made, in support of the correctness of the conclusions arrived at, to provisions. before cited, from the resolves of the legislature. to show that the scheme of the legislature was to permit the proprietors of the libellant's wharf to receive wharfage, in some cases, for the use of the wharf, in respect of goods, even when there was no landing on the wharf, or deposit on or transit over the wharf, of goods which had arrived by water. Thus, by the resolve of 1815, goods taken by water from, or by water put on board of, coasting vessels lying at the wharf, or attached to vessels made fast to the wharf, were required to pay half wharfage, even though the goods were not conveyed to or from the wharf, or any store adjoining the wharf. By the same resolve, all articles brought by land and left on the wharf, even though not imported by water, were required, after the expiration of four days, to pay the same rate of wharfage as if imported by water. In another direction, compensation was given directly for the use, by goods, of the wharf in front of a store or yard, irrespective of the landing of the goods in the store or yard, and for the use of the wharf to cart goods up and down the wharf, which had been landed on the wharf. Thus, by the resolve of 1819, goods other than lumber, landed from a coasting vessel into any of the back doors of the stores or back yards, if to be exported in a sea vessel without coming on to the wharf in front of said stores or yards, and all articles landed in the same manner from any vessel employed in foreign trade, and exported coastwise, without coming on to the wharf in front, were made subject to only one-half of the established rates of wharfage; and all articles landed from a coasting vessel into any of said stores or yards, if to be exported coastwise, and not coming on to the wharf in front, were required to pay only one-half of the landing wharfage, when landed, and one-half of the wharfage for putting on board, when taken off. By the same resolve, all articles landed on any part of the wharf, from a coasting vessel, if reshipped within two days coastwise, were required to pay but one wharfage, that is, not wharfage for landing and wharfage for putting on board, but only one of the two, in case such articles had not been carted up or down the wharf and had not been sold.

The present suit is a libel in rem against the steamer J. H. Starin, a packet boat plying daily between New Haven and New York. On each one of six days in January, February and March, 1877, she laid for a time, in the port of New Haven, at a wharf called the Derby Railroad wharf, which was within 416 feet of the libellant's wharf, and east of it, receiving and discharging freight and passengers. The Derby Railroad wharf is a wharf abutting on the Basin wharf and running outwardly from it in a southeasterly direction, and about in a line parallel with the libellant's wharf. On the days before named the steamer discharged and received on board a large quantity of goods, as freight, a great part of which were carted upon and over the libellant's wharf and that part of the Basin wharf which lies between the Derby Railroad wharf and the libellant's wharf. If the goods so carted upon and down the libellant's wharf and thence over the Basin wharf and the Derby Railroad wharf to the steamer, and those so unladen from the steamer and carted over the Basin wharf to, upon and up the libellant's wharf, had been originally laden upon, or unladen from, the steamer, while lying immediately alongside of the libellant's wharf, the wharfage on the same. which the libellant would have been entitled to charge and collect, would have been $76 10.

The canal company, before mentioned, in 1836, after it had constructed the basin and the Basin wharf, ceased to do business, and, prior to January 1st, 1848. it conveyed to the New Haven and Northampton Company all the rights which it had to the canal basin.

In 1845, the legislature of Connecticut, by a resolve (3 & 4 Priv. Laws Conn. p. 1380), gave to the New Haven and Northampton Company the right of collecting wharfage "at their Basin wharf," between the libellant's wharf and Tomlinson's wharf, at a rate not exceeding a tariff thereunto annexed, and established said tariff, with the proviso, "that neither the claims of any individual or individuals to be exempted from wharfage, nor the claims of said company to demand wharfage of such individual or individuals, shall be in any way affected by this resolve." At the same session of the general assembly a resolve was passed in these words: "Whereas a resolution has passed this assembly, at its present session, relating to the rate of wharfage on the Basin wharf in the city of New Haven: Resolved by this assembly, that nothing therein contained shall be construed to affect the rights of the Union Wharf Company or the contractors to rebuild and support Union wharf and pier in New Haven, to collect wharfage in any case whatever, or any other existing rights of said company."

The New Haven and Northampton Company, on the 24th of March, 1848, conveyed to the New York and New Haven Railroad Company all its rights to a part of said canal basin, comprising that part of it opposite to which the said Derby Railroad wharf is built, said basin being then disused. On the 7th of September, 1848, the libellant and the Union Wharf Company conveyed to the New York and New Haven Railroad Company the

right to cross the libellant's wharf with its railroad, and to fill up a certain part of the flats adjoining the east side of said wharf, within the limits of the canal basin, down to a point 731 feet southerly from the libellant's well at the head of said wharf. But the grants and consent were made upon the express conditions, that the grantors reserved the right to collect, on all goods landed by water, or taken off by water, on and from the wharves, or embankments, piers or bridges belonging to, or constructed or occupied by, the railroad company, and connected with the libellant's wharf on either side thereof, the same rate of wharfage as was then collected and received by said grantors on goods landed or taken off by water on and from the wharves attached to and connected with the libellant's wharf on the west side thereof, except on goods carried up or brought in the cars of the railroad company without otherwise coming on to the libellant's wharf, and except on goods to be used for railroad purposes on said railroad; and on the express further conditions, that no buildings should be erected or placed on the east side of the libellant's wharf, within 80 feet of the front line of stores then standing on the libellant's wharf, and that any railroad tracks which might be thereafter placed on the east side of the libellant's wharf, running northerly, should be placed between said wharf and any buildings which might be erected or placed on the east side thereof, on said adjoining wharves. The grantee, in the same deed, agreed that the grantors should have the said power of collecting so reserved by them, and that the grantee would observe all the conditions so expressed as those on which said grants and consent were given and made, according to the true intent and meaning of the same.

On the 19th of July, 1832, the libellant and the Union Wharf Company conveyed to the New York and New Haven Railroad Company permission to fill up its railroad embankment on the east side of the libellant's wharf, to extend southerly to the south side of the Basin wharf, from the said point distant 731 feet southerly from the said well, and to adjoin said embankment to the east side of the libellant's wharf, along the whole length thereof, from the termination of said former grant to the south side of the Basin wharf, on the express conditions and reservations, that the grantors should have the right to collect the same rates of wharfage on the embankments or wharf which might be built within said limits, and also on and from that part of the Basin wharf which extends for a distance of 416 feet of its length from its junction with the libellant's wharf, and also on all wharves which might be constructed or attached to the Basin wharf, within such distance of 416 feet, as were then collected by the grantors on the libellant's wharf, except on goods carried up or brought down

in the cars of the railroad company, without otherwise coming on to the libellant's wharf, and except also on goods to be used for railroad purposes on said railroad, with express further conditions as to the erection of buildings to the eastward of the libellant's wharf, and as to constructing a drain, and as to the location of wood yards and coal yards, and as to some other minor matters. The grantee agreed that the grantors should enjoy the right of collecting wharfage in the manner and on the wharves before reserved and specified, and that the grantee would observe all the conditions so expressed as those on which such grant and permission was given and made, according to the true intent and meaning of the same.

Under the said grants to the New York and New Haven Railroad Company, the part of the canal basin contiguous to the east side of the libellant's wharf was, prior to the 1st of January, 1874, filled up solid by said company down to the line of the Basin wharf, thus barring all immediate access by water to the easterly side of the libellant's wharf, north of the Basin wharf. Prior to 1874, all rights, franchises, property and obligations of the New York and New Haven Railroad Company became legally vested in the New York, New Haven and Hartford Railroad Company. The latter company, on the 9th of October, 1873, by a lease in perpetuity made by it to the New Haven and Derby Railroad Company, gave to that company certain rights, under which the Derby Railroad wharf, before mentioned, was constructed, in 1874.

The evidence shows, that, ever since the decision in the Hemingway suit, the proprietors of the libellant's wharf have claimed to collect, and have collected, wharfage for the use of such wharf to transport thereon goods coming on to it from the Basin wharf, and goods going from it on to the Basin wharf, which arrived by water in coasting vessels, or were shipped by water in coasting vessels, and were discharged upon the Basin wharf, or laden from the Basin wharf, except so far as the right to collect such wharfage was expressly parted with by the instruments before recited. It also appears, that the libellant exclusively keeps in repair the part of its wharf which lies northerly of its junction with the Basin wharf.

The affirmative defence set up in the answer is, that the Basin wharf is a part of the main land and a public highway; that the part of the libellant's wharf which is north of its junction with the Basin wharf is a part of the main land and a public highway; and that the wharf at which the steamer discharged and received said goods is more than three rods distant, to the eastward, from the libellant's wharf.

The question does not seem to be varied at all from what it was when the Hemingway Case was decided, so far as regards

goods in the situation of those involved in the present case, except so far as it may be varied by the fact, that, since then the canal basin has been filled up, so that what was then water has become land, continuous with the main land inside, and continuous with the Basin wharf on the outside. But, the Basin wharf was built and connected with the libellant's wharf by the permission of the libellant, and the libellant necessarily reserved all rights to wharfage which it did not expressly then part with. By the decision of the state court it had the right which is claimed in the present suit. That right was not parted with, in the grants to the canal company, or in the grants to the New York and New Haven Railroad Company, and the claimant can have no better position, as against the libellant, in respect of such right, than that company had or than the canal company had. The locus in quo of the discharge and shipment of the goods in this case is to the westward of a line crossing the Basin wharf at a distance of 416 feet east from the libellant's wharf. The libellant does not make, in the present case, a claim, by virtue of any of the instruments before recited, to any greater right than has been conferred upon it by statute, but only claims, that, while the right insisted on in this case was granted to it by statute, it has not parted with such right by any of such instruments.

The fact that the Basin wharf is connected with the main land by the filling in of the canal basin, or by the route through Brewery street, cannot vary the libellant's rights in the present case. The wharfage here claimed is for the use of the libellant's wharf by transporting the goods over it. If they had not been transported over it, but had been taken to or from the Derby Railroad wharf by the way of Brewery street, they would not have been subject to wharfage for being transported over the libellant's wharf.

On the evidence, the libellant's wharf must still be regarded as a wharf, on the part of it used by the goods in this case, so that the statutory rights given in respect to it remain, quoad such goods and their use of it, however much it may be a public highway in respect to goods not liable to wharfage for the use of it. If the libellant is usurping a franchise which does not belong to it, its title to such franchise can undoubtedly be tried by a proper judicial proceeding in the tribunals of the state. But, so long as the libellant's wharf is used for the transportation over it of goods coming from the Basin wharf on to it, or of goods going from it on to the Basin wharf, which goods have been discharged from, or are afterwards laden, on a coasting vessel, at the point on the Basin wharf where the goods in this case were discharged and laden, and so long as the decision in the Hemingway Case stands as the interpretation by the highest state court of the re-

solves of the legislature, so long must this court maintain the claim made by the libellant in this case.

By the resolve of 1810, it is provided, that, upon neglect or refusal to pay wharfage after notice and demand, it shall be lawful either to sue for the same at common law, or to distrain therefor, to the extent specified; and that the wharfage due for or on account of any vessel or the cargo thereof, shall be and remain a lien on such vessel until the same shall be discharged. It is clear, that the resolve means, that wharfage on cargo is to be a lien on the vessel until such wharfage is paid. It is left to the vessel to see that it is made secure for its liability, which it can well do, having possession of the goods, and being able to take care either that they do not pass over the libellant's wharf, or, if they do, that the proper wharfage therefor is paid.

The claim to a lien for wharfage in this case is such a claim as is cognizable in admiralty. The use of the libellant's wharf facilitated the operation of the steamer in loading and discharging, to such an extent that the legislature thought fit to give a lien on the steamer for the wharfage dues prescribed for the cargo. The use of the libellant's wharf, as it was used in this case, pertained to navigation by water, to such an extent that the implied contract for wharfage, in respect of the goods, may properly be regarded as a maritime contract, of benefit to the steamer, and, therefore, one the lien given for which by the resolve is cognizable and enforceable in the admiralty. The Lottawanna, 21 Wall. [88 U. S.] 558; Ex parte Easton, 95 U. S. 68; The Virginia Rulon [Case No. 16,974]. There was a sufficient notice and demand in this case prior to the bringing of the suit.

The libellant is entitled to a decree for $76 10, with interest thereon from July 1st, 1878, and for $80 73, its costs in the district court, and for its costs in this court.

I do not understand the libel in this case as making any claim for wharfage founded on any thing except the use of the libellant's wharf by the goods. It does not claim, in addition, that the steamer is liable for any wharfage prescribed for vessels, aside from the liability of the steamer for the wharfage prescribed for the goods. I, therefore, express no opinion on that question, nor on any question except the one distinctly involved in this case.